**Scott M. LEWIS, Plaintiff,**

v.

**The PAUL REVERE LIFE INSURANCE CO., Defendant and Third–Party Plaintiff**

v.

**Donald S. Abrams and Utica Mutual Insurance Company, Third-party Defendants.**

No. 98–C–792.

United States District Court, E.D. Wisconsin.

Jan. 18, 2000.

980

Alan Levy, Milwaukee, WI, for Plaintiff.

Paul Benson, Milwaukee, WI, for Defendant.

Burton Strnad, Milwaukee, WI, for Third Party Defendant.

## *ORDER*

ADELMAN, District Judge.

In this bad faith insurance case, the insured is suing the insurer, which in turn is suing the broker who filled out the application. In 1990 the insured, Scott M.

Lewis (formerly Scott M. Abrams), applied for and was issued a Paul Revere disability insurance policy. His application appears to have omitted or misrepresented several items, principally a history of counseling for emotional problems. Nonetheless, the policy had an incontestability provision, prohibiting Paul Revere from denying coverage for a claim more than two years into the policy on the ground that the application was completed with false answers.

In 1995, more than five years into the policy (and a month after getting married), Lewis fell backwards down a flight of stairs when a handrail broke, and submitted a disability claim. He suffered back and other physical problems from the fall, but over time the largest impediments to his returning to work proved to be depression and anxiety, combined with somatoform disorders which apparently cause him to feel greater pain and restriction of movement than his physical injuries warrant. Paul Revere paid benefits for more than two and a half years, but cut off payments in 1998 on the ground that Lewis was no longer disabled. Lewis then sued Paul Revere for breach of contract, bad faith, and intentional infliction of emotional distress.

The broker who filled out Lewis's application, based on information that Lewis provided, was Lewis's father, Donald S. Abrams. Abrams was an independent insurance agent who sold policies for several insurance companies; he had a broker agreement with Paul Revere. After Lewis filed suit against Paul Revere, Paul Revere filed a third-party claim against Abrams (as well as his errors and omissions insurer, Utica Mutual Insurance Company), asserting that if Abrams had correctly reported Lewis's history of emotional and mental disorders to Paul Revere when Lewis applied for disability insurance, it would not have issued the policy on the terms that it did. Paul Revere seeks to recover from Abrams the entire amount of disability payments it paid to Lewis from 1995 to 1998, any future payments it is ordered to pay, and—on counts of breach of fiduciary duty, intentional misrepresentation, and strict responsibility misrepresentation—punitive damages.

Before me are Paul Revere's and Abrams's motions for summary judgment.[1] This court has diversity jurisdiction; Lewis is a Wisconsin resident, and Paul Revere is incorporated in and has its principal place of business in Massachusetts. The law I apply is Wisconsin law as the law of the state in which this court sits. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Although Wisconsin law is clear on almost all claims before me, in one area it is necessary for me to predict how the Wisconsin Supreme Court would apply state law in this case. *See Kaplan v. Pavalon & Gifford,* 12 F.3d 87, 89 (7th Cir.1993).

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of a factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct.

---

1. Abrams has filed a cross-claim against Lewis for indemnification should he lose to Paul Revere, but no summary judgment motions have been filed on that claim.

2548, 91 L.Ed.2d 265 (1986), courts should act with caution in granting summary judgment, *see Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. *See id.* at 248, 106 S.Ct. 2505.

The moving party has the initial burden of demonstrating that he is entitled to judgment as a matter of law. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *See Id.* at 322–23, 106 S.Ct. 2548. Neither party may rest on mere allegations or denials in the pleadings, *see Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, or upon conclusory statements in affidavits, *see Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (7th Cir.1989). Both parties must produce documentary evidence to support their contentions. *See Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

2. The defining characteristic of somatoform disorder is persistent reports of pain or other physical symptoms which are not accounted for by a medical condition or another mental disorder. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 445 (4th ed.1994). Somatoform disorder is specifically distinguished from malingering because the symptoms are not voluntary and are experienced as real. *See id.*

The most relevant apparent example of somatization here is Lewis's continuing to report pain and to use, at first, a walker and, later, a cane, in the months and years follow-

## II. PAUL REVERE'S SUMMARY JUDGMENT MOTION

### A. Breach of Contract

■ Lewis contends that Paul Revere has breached its disability insurance contract, because he is (or at least as of the date of the complaint, was) totally disabled within the policy's definition, and could not return to his former work in insurance sales, where he had earned as much as $75,000 to $100,000 per year. The psychological problems from which Lewis currently suffers, and on which he rests the weight of his contention that he cannot return to work, are principally depression, anxiety, and somatoform disorder.[2]

Lewis's disability policy excludes coverage for disabilities which first manifested themselves before coverage began in 1990. It is undisputed that Lewis had fourteen sessions with a psychiatrist in 1983 following an arrest and allegations that he participated in a car break-in and theft of a car stereo at age 19 (although the parties strongly disagree about whether these sessions constituted treatment for a mental disorder), and that he was in counseling with a psychiatrist again in 1986, 1989, 1990, and 1991; and again from 1992 through 1994. For reasons that do not appear on the briefs before me, Paul Revere did not rely upon the "first manifestation" clause in terminating Lewis's benefits.

Nonetheless, Paul Revere's reasoning bears certain similarities to a first manifestation argument, because it looks to Lew-

ing his fall down the stairs, even though his treaters found that there were no ongoing physical injuries that required this. A juror could reasonably infer that this was something other than a conscious ploy to manipulate others and gain sympathy on Lewis's part, because over time Lewis appears to have been increasingly closed in and to have restricted his attendance at social gatherings due to the shame and embarrassment he reported feeling when others saw him using the cane. Lewis simultaneously described the cane as necessary to prevent further back pain and as a psychological crutch which embarrassed him. (R. 96 Ex. H at 2, 8.)

is's psychological problems before his fall in 1995. Specifically, Paul Revere argues that Lewis was not disabled under his policy when it terminated his benefits: he had recovered from whatever back and other physical problems he suffered in the fall, and because he had suffered similar psychological problems before the fall and could work then, he could return to work now.[3] As we will see, the reports on which Paul Revere relied before terminating Lewis's benefits simply compared lists of pre- and post-fall psychological problems from which Lewis suffered. Although the similarity of those lists might have been enough to deny coverage under a first manifestation clause—an option which Paul Revere did not pursue—Paul Revere did not analyze how severe Lewis's conditions were when it terminated his benefits. This question is at the heart of whether Lewis was disabled under the policy. The contract provides:

"Total Disability" means that because of Injury or Sickness:

a. You are unable to perform the important duties of Your Occupation; and

b. You are not engaged in any other gainful occupation; and

c. You are under the regular and personal care of a Physician.

(R. 57 Ex. J at Ex. B ¶ 1.9.)

Paul Revere obtained two independent medical examinations of Lewis, and had an in-house medical examiner review the resulting reports.[4] The first expert to examine Lewis, Dr. Layde, reported that in terms of functioning, Lewis "is a very unhappy man ... His anxiety and depression seem to be moderately severe and occur daily." (R. 57 Ex. J at Ex. M at 6.) Dr. Layde provided a Global Assessment of Functioning of 50. (*See id.* at 1) This assessment indicates either serious symptoms or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994) [hereinafter *DSM–IV*] (emphasis omitted). Dr. Layde explicitly found that Lewis had not returned to his pre-fall level of functioning, writing that "I believe that optimal treatment could result in a return of Mr. [Lewis] to pre-disability level of functioning." (R. 57 at Ex. J at Ex. M at 7.) Despite finding such serious impediments to functioning, Dr. Layde ascribed Lewis's not working to "choice, career dissatisfaction, entitlement, and especially adoption of the sick role." (*Id.*) Dr. Layde found that because Lewis had suffered from similar psychological problems before his fall and could work then, he could still work. Dr. Layde did not assess the relative severity of Lewis's pre- and post-fall psychological problems, but simply noted that Lewis had been treated from 1992 through 1994 for "numerous problems with self-esteem and depression, as well as relationship problems." (R. 57 Ex. J at Ex. M at 4.)

Paul Revere's second expert, Dr. Wiedel, performed a Minnesota Multiphasic Personality Inventory—2 and prepared a personality evaluation. He concluded:

[Lewis] is showing significant amounts of anxiety and rumination at this time. He has a significant number of somatic

3. One of Lewis's care-givers, Dr. Frankel, observes that before Lewis's fall there was no hint of somatoform disorders, obsessive/compulsive behavior, or an inability to work due to any combination of physical and mental factors. (R. 96 Ex. F at 4.) Paul Revere does not contest this observation, although as noted it does assert that Lewis is able to work.

4. Paul Revere has also submitted three pages of an anonymous report entitled "Provident Internal Memorandum" which it attributes to a fourth professional, Dr. Anfang. (R. 57 Ex. J at Ex. Q.) Because this report was written in October 1998, more than three months after Paul Revere decided to terminate Lewis's benefits, it is not evidence of Paul Revere's state of mind when it made the decision. In addition, because the report is based on a review of records, rather than an examination of Lewis, and because it largely endorses Dr. Layde's conclusions, I find it to have little independent weight and do not discuss it independently.

complaints. He also is feeling very depressed and unhappy. There is a lot of anger present, and feelings of ego alienation from both self and others. [Lewis's] condition is seen as longstanding, one which occurred probably prior to his injury of his back. His back injury has exacerbated his symptomatology.

(R. 57 Ex. J at Ex. N at 3.) Dr. Wiedel's personality evaluation did not assess Lewis's ability to return to work.

Paul Revere's in-house medical examiner, Dr. McDowell, did not examine Lewis, but based upon reviewing his records and the reports from Dr. Layde and Dr. Wiedel, concurred with Dr. Layde that because Lewis had similar emotional problems before his fall as he does now, he is not disabled. Indeed, Dr. McDowell—going further than either of the Paul Revere experts who actually examined Lewis—found "a high suspicion of malingering." (R. 57 Ex. J at Ex. O at 1.)

All of the professionals who have examined Lewis, both Paul Revere's and his own, agree that Lewis sometimes overstates the intensity of the phenomena that he experiences. They ascribe the overstatements variously to hypochondria, a desire to ensure that others appreciate the intensity of what he experiences, malingering, or assuming a sick role. None, however, dispute that, as Dr. Wiedel put it, "He is in a state of extreme misery and fear." (R. 57 at Ex. J at Ex. N at 2.)

Lewis, for his part, presents his experts' reports, including those of his care providers, indicating that he is not able to return to work. His primary care-giver, Dr. Frankel, wrote that his fall "has severely and negatively effected [sic] his ability to work effectively in several ways"; that he is still impaired from working at the effective level he did before the fall; and that "his symptoms and conditions make it unlikely for him to be able to perform duties of his work as an insurance salesman at this time." (R. 96 Ex. B at 8, 5). Dr. Frankel vigorously disputed Dr. McDowell's suggestion of malingering, on the ground that "the symptoms are not consciously produced, nor are they made up"; rather, they are produced unconsciously as part of a somatoform disorder and are experienced as real. (*Id.* at 5.)

Lewis's second care-giver, Dr. Brehm, wrote that as of October 1995, four months after the fall, Lewis's "sleep disturbance, panic symptoms, generalized anxiety, impaired concentration, ruminations, low energy, helplessness and hopelessness and self-criticism severely compromised his ability to attend to the details of his work, much less come across to a potential [insurance] client as confident or competent." (R. 96 Ex. E at 2.) As of the time that she was writing, in February 1999, she evaluated Lewis with a Global Assessment of Functioning of 30. (*Id.* at 1.) This assessment indicates (as relevant here) an "inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." *DSM–IV* at 32. The reports of Lewis's own care-givers, made in the month corresponding to Paul Revere's final "extra contractual" check (Dr. Frankel's October 1998 report) and four months later (Dr. Brehm's February 1999 report) should be given particular weight and are sufficient on their own to preclude a grant of summary judgment. *See Winter v. Minnesota Mut. Life Ins. Co.*, No. 99–1031, 1999 WL 1101404, at *10 (7th Cir. Dec. 3, 1999).

An independent medical examiner retained by Lewis, Dr. Zigun, assessed Lewis in June 1999 with Global Assessment of Functioning level of 40, due to "serious impairment in not keeping a job, and serious social dysfunction." (R. 96 Ex. H at 10.)[5] Dr. Zigun found that Lewis's fall down the stairs "altered his psychiatric

---

5. As relevant here, a Global Functioning Assessment of 40 indicates "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM–IV* at 32.

course and substantively contributed to his inability to work." (*Id.* at 11.) Lewis feels socially restricted to the extent of being afraid to answer his own door, attend his own synagogue, or go out to a restaurant in his own community. (*See id.* at 8, 10.) Beyond the problems that this level of social restriction would impose on a worker in any field, insurance sales in particular—Lewis's former line of work—frequently imposes adversarial situations, and Lewis feels unable to function well in such adversarial situations. Like Dr. Frankel, Dr. Zigun attacked Paul Revere's imputation of malingering, asking what the motivation could possibly be:

> [H]ow and why would he sustain the apparently painful charade[?] He was successful, earned more money, had as [sic] sense of accomplishment and now functions as a psychiatric cripple. He was social with others, and apparently had a hopeful future with his wife. He has now 'consigned himself' to lower income, the allegations of others of deceit, avoidance of prior friends and acquaintances, [and] limits any recreation.

(*Id.* at 11.) On this basis, Dr. Zigun concludes that Lewis's psychological impairments are quite genuine.

In addition, Lewis has applied for and received Social Security Disability Insurance ("SSDI") benefits. (R. 96 Ex. A ¶ 11.) Such benefits are awarded only on a finding that the individual is unable to engage in any substantial gainful work in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). In addition—responding to Paul Revere's accusations of malingering—SSDI benefits cannot be awarded based solely on an individual's subjective reports of pain. Rather, "there must be medical signs and findings . . . which show the existence of a medical impairment that results from . . . psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged, and which . . . would lead to a con-

clusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).

The reports of the independent medical examiners whom Paul Revere hired to evaluate Lewis thus do little to undermine the evidence from Lewis's treaters, independent medical examiner, and the Social Security Administration that his functioning was seriously compromised as of October 1998, the month corresponding to Paul Revere's last "extra contractual" check. Dr. Layde assigned a Global Assessment Functioning level that indicated serious impairment in functioning—one of the *DSM–IV*'s examples is specifically an individual's inability to keep a job—and found that Lewis suffered from moderately severe depression and anxiety every day. Dr. Weidel found that Lewis suffered from anxiety, depression, and somatization, all exacerbated by the fall, and made no findings regarding Lewis's ability to return to work. A reasonable juror could conclude from Paul Revere's reports alone that Lewis was unable to work when Paul Revere terminated his benefits.[6]

■ This result is consistent with the general rule that summary judgment can only rarely be granted where the insured's ability to return to work is in question. The parties agree that Lewis reports ongoing pain even though there is little or no objective medical evidence of continuing physical injury—a defining characteristic of somatoform disorders, as discussed above—and Paul Revere argues that Lewis's failure to return to work is due to choice and that his reported symptoms are due to malingering. One important question is thus the extent to which Lewis's reports of pain and of ongoing impairment due to depression and anxiety should be believed. The Wisconsin Supreme Court has held that in cases where reports of pain are not supported by objective medical evidence of ongoing physical injury:

---

**6.** Because a reasonable juror could find that Lewis was wholly unable to work, there is no need to discuss Paul Revere's alternative argument that Lewis was entitled only to partial disability benefits and should therefore recover nothing in this action, on the ground that his complaint asserts only a wrongful denial of total disability benefits. (R. 55 at 24–27.)

The jury is entitled to believe the claimant even where there is no readily observable 'objective' symptom which might account for the pain.

. . . .

... Whether the plaintiff was truthful with respect to his complaints of pain and his consequent inability to pursue his regular occupation or any other occupation requiring physical labor is, of course, a matter for the jury.

*Drexler v. All Am. Life & Cas. Co.*, 72 Wis.2d 420, 428, 429, 241 N.W.2d 401 (1976). In addition, total disability is a relative concept that must be tested with regard to the particular situation of a particular insured. *See Harker v. Paul Revere Life Ins. Co.*, 28 Wis.2d 537, 547, 137 N.W.2d 395 (1965). Whether an insured is totally disabled is thus a question of fact that generally must be submitted to a jury. *See* Eric Mills Holmes & Mark S. Rhodes, 1 *Holmes' Appleman on Insurance* § 1.27 at 138, 143 (2nd ed.1996). None of the evidence submitted suggests that this case is exceptional in this regard.

■ I now turn to the crux of Paul Revere's argument. Paul Revere contends that because Lewis suffered from depression and anxiety before his fall but could work then, he must be able to work now, because he is not suffering any new conditions.[7] This argument reveals a deep misconception about the nature of mental illness.

As elaborated by the American Psychiatric Association in the *DSM–IV*, depression in particular is a chronic, recurrent illness. It is characteristic for its intensity to wax and wane over periods of time. New depressive episodes are frequently (although not invariably) triggered by external stressors.[8] It is thus quite consistent with depression for a patient to be able to perform the essential functions of a job—and even derive satisfaction from doing so—while nonetheless being treated for depression. However, the same patient's level of functioning and self-confidence can plummet when a new depressive episode strikes. In its most extreme forms, depression can be exceptionally debilitating, requiring hospitalization. But even when a depressive episode is not that severe, it can greatly interfere with many aspects of day-to-day functioning, not only sapping an individual's will-power, but also interfering with sleep patterns and the ability to concentrate and focus on tasks, as well as diminishing the individual's self-confidence and ability to take on tasks. Similar cycles are common with anxiety; anxiety and worry often worsen during times of stress, further interfering with the individual's ability to rise to the new challenges that the stressors pose. (R. 96 Ex. E at 2–3; R. 96 Ex. F at 4; *DSM–IV* at 320–27, 434.)

Paul Revere's position appears to be that it is conceptually impossible for an insured who is both employed and being treated for depression and anxiety to have those conditions so severely exacerbated by an external stressor that he or she becomes unable to work. Its syllogistic argument—Lewis was depressed and anxious before his fall, Lewis is still depressed and anxious, he could work then, therefore he can work now—appears to reveal an insensitivity to how environmental factors commonly affect depression and anxiety.

**B. Bad Faith Denial of Coverage**

■ Lewis contends not only that he was (and is) entitled to benefits, but also

---

7. As noted above, Dr. Frankel observes without contradiction from Paul Revere that Lewis's somatoform disorders are new. Dr. Frankel also contends that Lewis's current depression should be considered a reactive depression (reacting to the physical incapacitation and pain caused by the 1995 fall) rather than a continuation of any prior depression. (R. 96 Ex. F at 2–3.) Although such considerations would be relevant if Paul Revere had terminated Lewis's benefits under a first manifestation clause, they do not need to be considered here; the only issue here is whether Lewis was able to work when Paul Revere terminated his benefits.

8. Dr. Weidel's report implicitly recognizes this, in acknowledging that Lewis's fall exacerbated his symptomology.

that Paul Revere's conduct in investigating his condition and terminating his benefits was so unreasonable as to constitute a tort. Wisconsin law specifically recognizes that by virtue of the relationship between the parties created by an insurance contract, a special duty arises from the insurer to the insured, a breach of which duty is a tort and is unrelated to contract damages. *See Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 686, 271 N.W.2d 368 (1978); *DeChant v. Monarch Life Ins. Co.,* 200 Wis.2d 559, 569, 547 N.W.2d 592 (1996). The relevant facets of Paul Revere's investigation are as follows. In February 1996, Paul Revere referred to Dr. McDowell the question of whether the psychological problems for which Lewis was being treated had first manifested themselves before the fall.

In addition to observing that the symptoms for which Lewis was currently being treated were similar to those for which he had been treated in 1986—four years before coverage began—Dr. McDowell also observed that several physicians who had seen Lewis recently agreed that there was no objective evidence of continuing physical impairment from his back injury, and he speculated that Lewis might either be suffering from a somatoform disorder, or malingering for "secondary gains"—such as undeserved disability benefits. (R. 57 Ex. L at Ex. 7.)

More than two years later, in March and April 1998—after accusing Lewis and his father of fraud and asserting that Abrams was responsible for all of Lewis's disability benefits [9]—Paul Revere scheduled Lewis's Independent Medical Examinations with Dr. Layde and Dr. Wiedel. As discussed above, these doctors' evaluations found that Lewis suffered considerably from depression, anxiety, and somatoform disorders. Dr. Layde's assessment of Lewis's functionality level indicated that he believed Lewis suffered from serious impairment; one of the two examples in the

*DSM–IV* of the level of functioning he assigned is of an individual unable to hold a job. Dr. Wiedel did not evaluate Lewis's ability to hold a job; he had been asked only to assess Lewis's personality functioning, and found that he was "very depressed" and in a "state of extreme misery and fear." (R. 57 Ex. J at Ex. N at 2, 3.)

Dr. Layde's conclusion that Lewis could in fact work was in no way based upon his assessment of the signs and symptoms Lewis actually presented; he quotes Lewis as saying, for example, "I feel as if I'm in a waiting room for death" and becoming teary. (R. 57 Ex. J at Ex. M at 3.) Rather than explain why he believed that Lewis could successfully return to the important tasks of his prior work as a $75,000 to $100,000 per year insurance salesman while suffering every day from what Dr. Layde himself found to be moderately severe depression and anxiety, Dr. Layde instead reported that Lewis could work based upon the simplistic syllogism discussed above: Lewis had suffered from similar psychological conditions before his fall; he could work then; therefore he could work now. But although he found that Lewis's list of psychological *conditions* were similar before and after the fall, Dr. Layde did not compare the *severity* of these conditions. Indeed, Dr. Layde explicitly found that Lewis had not returned to his pre-fall level of functioning, writing that "I believe that optimal treatment could result in a return of Mr. [Lewis] to pre-disability level of functioning." (R. 57 at Ex. J at Ex. M at 7.)

Paul Revere then submitted Dr. Layde and Dr. Wiedel's reports to Dr. McDonald for an in-house review. As discussed above, Dr. McDonald not only adopted Dr. Layde's syllogism to find that Lewis was able to work now based upon his ability to work before the fall, but went beyond either report to find a high suspicion of malingering, rather than somatoform dis-

9. Lewis argues that much of Paul Revere's *motivation in finding a pretext to terminate* his benefits stemmed from its belief that he and his father had committed fraud. His brief accordingly spends much effort detailing the history of Paul Revere's investigation into the claim of fraud. I do not find it necessary to reach those issues.

orders. Dr. McDonald did not discuss the first manifestation issue. His review of Dr. Layde's finding that Lewis could work (because he had suffered from similar psychological problems before) consisted of quoting one phrase and adding, "I concur."

Four days after Dr. McDowell's report, Paul Revere wrote Lewis's counsel that it was terminating Lewis's benefits. The rationale was not that he suffered from a condition that had first manifested before coverage under the policy, but because Paul Revere had found that he could work:

> The physicians involved with the IME have found evidence for depression, anxiety, somatization, and personality problems. However it was also found that Mr. [Lewis] was able to work as an insurance salesman prior to his fall in 1995, despite his having very similar psychological and psychiatric problems prior to the injury as he has now. . . .
>
> . . . .
>
> . . . It appears from the information in your client's claim file which includes the results of the IME, that your client is not disabled at this time.

(R. 57 Ex. J at Ex. P.)

■ Against this background, I may now assess the bad faith claim. Under Wisconsin law, there are two prongs to bad faith, one objective and the other subjective. The tort arises when an insurer lacks a reasonable basis for terminating benefits under a policy (the objective prong) and knows or recklessly disregards

that it lacks a reasonable basis for terminating the benefits (the subjective prong). *See Anderson*, 85 Wis.2d at 691, 271 N.W.2d 368. At trial, the plaintiff must prove both prongs by evidence that is clear, satisfactory, and convincing (Wisconsin's "middle" burden of proof). *See* Wis. JI–Civil 205, 2761 (1998).

■ Under the objective prong, the insurer must properly investigate the claim. *See Anderson*, 85 Wis.2d at 692, 271 N.W.2d 368. This requires making a diligent effort to ascertain the facts necessary for an intelligent and good-faith judgment about a claim. *See Hilker v. Western Auto. Ins. Co.*, 204 Wis. 1, 15, 231 N.W. 257 (1931). The investigation must be neutral and detailed. *See Fehring v. Republic Ins. Co.*, 118 Wis.2d 299, 313, 347 N.W.2d 595 (1984) (citing *Benke v. Mukwonago–Vernon Mut. Ins. Co.*, 110 Wis.2d 356, 364, 329 N.W.2d 243 (Ct.App.1982)). The mere fact that coverage under a policy is ultimately upheld is not sufficient to establish the objective prong; it is not bad faith for an insurer to deny a claim when the question of policy coverage is fairly debatable. *See Mowry v. Badger State Mut. Cas.*, 129 Wis.2d 496, 516–17, 385 N.W.2d 171 (1986). An insurer is not liable merely for conducting a flawed investigation; the plaintiff must prove that there was no objectively reasonable basis to deny coverage. *See Mills v. Regent Ins. Co.*, 152 Wis.2d 566, 575, 449 N.W.2d 294 (1989).[10]

---

10. I must address Paul Revere's briefing. Lewis cites *Fehring*, 118 Wis.2d at 313, 347 N.W.2d 595, for the type of investigation that an insurer must provide to avoid bad faith liability. Paul Revere contends that *Fehring* was overruled by *DeChant*, 200 Wis.2d 559, 547 N.W.2d 592, and therefore *"Fehring* is of no value and must be disregarded by this Court."* (R. 125 at 4.) A cursory glance at *DeChant* reveals that it does not discuss the only issue for which Lewis cited *Fehring*, namely, how bad faith may be established. And reading *DeChant* shows that it overrules *Fehring* only to the extent that *Fehring* held that attorney's fees may be recovered in a bad faith action. *See DeChant*, 200 Wis.2d at 577, 547 N.W.2d 592. On the issue of the ele-

ments of bad faith, *Fehring* thus remains good law.

In a similar fashion, in its response to Abrams's motion for summary judgment, Paul Revere claims that a second case was overruled and of no value to this court. Paul Revere there asserts that *Jones v. Reliance Insurance Co.*, 607 F.2d 1 (D.C.Cir.1979)— cited by Abrams for the construction of the words "disease" and "disorder" in insurance contracts—was "overruled" by *Harbor Insurance Co. v. Schnabel Foundation Co.*, 946 F.2d 930, 936–37 (D.C.Cir.1991), and that *Jones* therefore "is of no value to the Court." (R. 88 at 10.) But the issue on which *Harbor Insurance* overturned *Jones* had nothing to do with how to construe "disease" or "disorder," but rather the standard of review for certain

■ In this case, Paul Revere initially referred to Dr. McDowell in 1996 the question of whether Lewis's psychological problems had first manifested prior to coverage. He answered yes, but raised the specter that Lewis, despite his protestations, was actually able to work. Paul Revere postponed having Lewis attend independent medical examinations until 1998, but even then neither of the independent examiners found that Lewis could work based upon an assessment of the severity of his condition. Rather, one did not assess his ability to work at all, and the other found that his level of functioning was seriously impaired and that he had not returned to his pre-disability level of functioning. To the extent that Dr. Layde made a "finding" that Lewis's current psychological problems did not prevent him from working because the severity of the Lewis's problems before his fall had not prevented him from working then, a reasonable juror could find by evidence that is clear, satisfactory, and convincing that Paul Revere's investigation was not the product of a neutral, detached, and diligent search for the facts.

■ Another way to test the objective prong is to inquire whether a reasonable insurer would have denied benefits if it had conducted a proper investigation. *See Mills,* 152 Wis.2d at 575, 449 N.W.2d 294 (quoting *Pace v. Insurance Co. of N. America,* 838 F.2d 572, 584 (1st Cir.1988)); *James v. Aetna Life & Cas. Co.,* 109 Wis.2d 363, 370, 326 N.W.2d 114 (Ct.App. 1982); *Anderson,* 85 Wis.2d at 692, 271 N.W.2d 368. In this case, Paul Revere has offered no evidence about other insurance companies' practices. It has not established that all reasonable jurors must agree that a reasonable insurer would find that Lewis was able to return to the important tasks of his previous work as an insurance salesman and terminate his benefits even though an independent medical examiner it hired found that he had a global assessment of functioning level of

50, indicating seriously impaired functioning.

■ After making an investigation, the insurer must weigh the facts ascertained in a "fair and honest way." *See Poling v. Wisconsin Physicians Serv.,* 120 Wis.2d 603, 608, 357 N.W.2d 293 (Ct.App.1984). The insurer must subject the results of its investigation to a reasonable evaluation and review. *See Anderson,* 85 Wis.2d at 692, 271 N.W.2d 368. As Paul Revere's in-house medical reviewer, Dr. McDowell was charged with this responsibility. His report reveals that he did not address Dr. Wiedel's findings that Lewis was very depressed and that the fall had exacerbated Lewis's psychological problems. The report further shows that Dr. McDowell did not address Dr. Layde's assessments that Lewis suffered from a serious impairment in functioning; suffered from moderately severe depression and anxiety every day; and had not returned to his pre-disability level of functioning. Dr. McDowell's review of the evidence regarding Lewis's ability to work was limited to quoting a phrase from Dr. Layde's syllogistic conclusion that Lewis had suffered from similar psychological conditions before his fall, had been able to work then, and therefore was able to work now, and adding "I concur." Like Dr. Layde, Dr. McDowell did not compare the severity of Lewis's psychological problems before the fall with their severity after the fall. Indeed, Dr. McDowell went further than either of the independent medical examiners who had actually seen Lewis and whose opinion Paul Revere had sought out, to find a high suspicion of malingering. A reasonable juror could thus find that Dr. McDowell's report constitutes evidence that is clear, satisfactory, and convincing that Paul Revere did not subject Dr. Layde and Dr. Wiedel's reports to a reasonable evaluation and review. A reasonable juror could also find, by evidence that is clear, satisfactory, and convincing, that because Dr. McDo-

denials of directed verdict motions. Such unwarranted claims about the precedential

value of cases cited by opposing parties are discouraged.

well's report did not even mention the independent medical examiners' findings that Lewis was very depressed, that his functioning was seriously impaired, and that he had not returned to his pre-disability level of functioning, Paul Revere did not weigh all of the facts discerned by its investigation in a fair and honest way.

■ Examination thus proceeds to the subjective prong: Did Paul Revere know or recklessly disregard that it lacked a reasonable basis for terminating benefits? The knowledge of the lack of a reasonable basis may be inferred and imputed to an insurer where there is a reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts. *See Anderson*, 85 Wis.2d at 693, 271 N.W.2d 368. In this case, the face of Dr. Layde's report provided his findings that Lewis suffered from moderately severe depression and anxiety every day, had a Global Assessment of Functioning of 50, indicating seriously impaired functioning, and had not returned to his pre-fall level of functioning. Neither he nor Dr. McDowell made any effort to reconcile these findings with their conclusion that Lewis was able to return to the important tasks of his pre-fall work as an insurance salesman earning $75,000 to $100,000 per year.[11] A reasonable juror could find that this constitutes evidence that is clear, satisfactory, and convincing that Paul Revere demonstrated a reckless disregard of its lack of basis for terminating Lewis's benefits. On that basis, Paul Revere has not met its burden for summary judgment on Lewis's bad faith claim.

## C. Intentional Infliction of Emotional Distress

Lewis asserts that he suffered severe emotional distress from Paul Revere's conduct surrounding its investigation into and termination of his disability benefits. In January 1996 his primary care-giver, Dr. Frankel, advised a Paul Revere claims in-

vestigator, Craig Maxim, that contacting Lewis was not "indicated," would "not particularly be good," and might be "less than helpful." (R. 96 Ex. C at 114.) Twenty-two months later, Paul Revere sent Lewis a copy of a letter it wrote to his father, Abrams, on November 21, 1997, six days before Thanksgiving 1997, asserting that Abrams had breached his fiduciary duty to Paul Revere by allowing an application to be submitted with what he knew or should have known were falsehoods; that Abrams was liable for all of Lewis's disability benefits, past and future; and that Paul Revere would initiate litigation if Abrams did not respond within fourteen days. (R. 57 Ex. J at Ex. H.) Five days later Paul Revere wrote Lewis directly, asserting that his father was responsible for any further benefits due on the claim. (R. 57 Ex. J at Ex. I.) This letter acknowledged that Paul Revere had already sent Lewis a copy of its November 21, 1997 letter to Abrams, but enclosed a second copy nonetheless. Lewis contends that these actions, combined with Paul Revere's conducting an investigation that he contends was designed to lead to a foreordained conclusion that he was not disabled and terminating his benefits, intensified the depression and especially the anxiety from which he was already suffering.

■ The Wisconsin courts have specifically recognized that there may be cases where, in an action against an insurer for bad faith, an insured can also prove intentional infliction of emotional distress. *See Anderson*, 85 Wis.2d at 695, 271 N.W.2d 368. To prove the tort of intentional infliction of emotional distress, the plaintiff must establish (1) that the conduct caused emotional distress; (2) that the emotional distress was extreme and disabling; (3) that the conduct was intended to cause emotional distress; and (4) that the conduct was extreme and outrageous. *See Alsteen v. Gehl*, 21 Wis.2d 349, 359–60, 124

---

11. It appears that Paul Revere first compared the severity of Lewis's pre- and post-fall psychological problems only *after* terminating his

benefits. See, e.g., the anonymous report attributed to Dr. Anfang, dated October 19, 1998. (R. 57 Ex. J at Ex. Q.)

N.W.2d 312 (1963). The plaintiff bears the same burden of proof at trial as required for bad faith, namely, proving all elements of the claim by evidence that is clear, satisfactory, and convincing. *See* Wis. JI–Civil 205 (1998), 2725 cmt. (1997).

I find that Lewis has presented sufficient evidence on the first two elements, that the third is a close call, and that Lewis had not established the fourth element sufficiently to go to a jury. On the element of causation, Paul Revere contends that any depression, anxiety, and other emotional distress that Lewis suffers is due solely to his underlying condition (even if possibly exacerbated by the fall). The implication is that it is not possible to differentiate among possible multiple factors leading to a plaintiff's emotional distress. To the contrary, Wisconsin law has held otherwise for more than thirty-five years. *See Alsteen*, 21 Wis.2d at 359, 124 N.W.2d 312 (holding that where plaintiff was diagnosed with depression and an ulcer before she even met the defendant, "[p]sychiatry and clinical psychology, while not exact sciences, can provide sufficiently reliable information relating to ... the causal relationship between the injury and the defendant's conduct, to enable a trier of fact to make intelligent evaluative judgments on a plaintiff's claim.").

In this case, Dr. Frankel reports that the cessation of Lewis's benefits heightened Lewis's stress and anxiety, which in turn intensified the physical pain Lewis experienced. (R. 96 Ex. B at 9–10.) From this evidence, a reasonable juror could conclude by evidence that is clear, satisfactory and convincing that Paul Revere's conduct inflicted emotional distress upon Lewis distinct from and in addition to the distress already caused by his depression and anxiety.

On the element of severity, Lewis must demonstrate that, due to Paul Revere's conduct, the additional emotional distress he suffered was "extremely disabling." *Alsteen*, 21 Wis.2d at 360, 124 N.W.2d 312. This is defined as distress that rendered him unable to function in other relationships, *see id.*, or as anxiety of such substantial quantity or enduring quality that no reasonable person could be expected to endure it, *see Evrard v. Jacobson*, 117 Wis.2d 69, 73, 342 N.W.2d 788 (Ct.App.1983). Dr. Frankel compares Paul Revere's bringing Lewis into its dispute with his father and terminating his benefits to two football players double-tackling a hypersensitive and already-injured third player, knowing that he is injured and out of condition. According to Dr. Frankel, the additional stress, especially due to Lewis's seeing his father's retirement and financial well-being at threat, adversely affects Lewis's condition, leading him to respond with heightened anxiety, deepening depression, and heightened somatoform discomfort and pain. (R. 96 Ex. B at 10.) A reasonable juror could find by evidence that is clear, satisfactory and convincing that the required level of extremity is present in the additional anxiety, depression, and somatoform pain and discomfort that Lewis asserts is due to Paul Revere's conduct.

On the issue of intent, Paul Revere claims that it sent Lewis two copies of its November 21, 1997 letter to his father and its own letter to him a week later in adherence "to its duty to keep its insured fully informed of the status of his claim." (R. 55 at 15.) Lewis's discovery efforts have apparently not revealed a "smoking gun" memo admitting that Paul Revere sent him these letters for any other purpose (although of course if there were any such understanding it would be unlikely to be reduced to writing). Moreover, the tentative nature of Dr. Frankel's January 1996 statements to the Paul Revere claims investigator and the twenty-two month time gap defeat an inference that Paul Revere willfully defied instructions from Lewis's doctor not to contact him. On the other side, these letters mailed immediately before Thanksgiving were likely to cause great internal turmoil in pitting Lewis's interest in receiving the benefits he believed he was due against his and his father's interest in preventing his father

from being sued. Paul Revere asserts that it sent the letters only because it had a duty to inform Lewis about the status of his claim, but it has not shown that it wrote Lewis about any other intermediate step relevant to his claim. It is a close call whether a reasonable juror could find by clear, satisfactory and convincing evidence that Paul Revere's proffered rationale was pretextual.

■■■■■■ I find it unnecessary to resolve the element of intent, because it is clear that Lewis fails to meet his burden on the element of extreme and outrageous conduct. The standard requires that "the average member of the community must regard the defendant's conduct in relation to the plaintiff, as being a complete denial of the plaintiff's dignity as a person." *Alsteen*, 21 Wis.2d at 359–60, 124 N.W.2d 312. Mere carelessness and bad manners is insufficient. *See Gianoli v. Pfleiderer*, 209 Wis.2d 509, 524, 563 N.W.2d 562 (Ct.App. 1997). The only case cited by the parties which upheld a finding of extreme and outrageous conduct involved adjacent property owners who not only sent negative letters to bank officials to interfere with plaintiffs' refinancing efforts, but also engaged in near constant surveillance and harassment of plaintiffs. *See Gianoli*, 209 Wis.2d at 524, 563 N.W.2d 562. In this case, Paul Revere sent Lewis two copies of its letter to his father and another letter addressed to Lewis himself, twenty-two months after being told, somewhat vaguely, that contacting Lewis directly would "not particularly be good" and might be "less than helpful." And it did so without asking Lewis's care-givers whether contacting Lewis directly with accusations of fraud might be harmful. Paul Revere's behavior in this regard thus falls short of the concern for the well-being of its insured which might be hoped for. Nonetheless, it

does not sink to the required level of denying Lewis's dignity as a person or *Gianoli*'s pattern of near-constant surveillance and harassment. Paul Revere is accordingly entitled to summary judgment on Lewis's claim of intentional infliction of emotional distress.

## III. ABRAMS'S SUMMARY JUDGMENT MOTION

Paul Revere filed a third-party claim against Lewis's father Abrams, contending that he is liable to Paul Revere on half a dozen theories. Abrams disputes all claims.

### A. Misrepresentation

Paul Revere presses three misrepresentation claims against Abrams for filling out Lewis's apparently false answers on Lewis's application: intentional misrepresentation, negligent misrepresentation, and strict responsibility misrepresentation. Abrams seeks summary judgment on all three on the ground that Abrams made no representations, and thus no misrepresentations.

#### 1. Statute of limitations

The three misrepresentation claims are each species of fraud. *See Whipp v. Iverson*, 43 Wis.2d 166, 169, 168 N.W.2d 201 (1969) ("Fraud is a generic and an ambiguous term. It embranches misrepresentation which may be separated into the three familiar tort classifications of intent, negligence, and strict responsibility."). The statute of limitations for fraud is Wis. Stat. Ann. § 893.93(1)(b) (West 1997).[12] A claim must be brought within six years of discovery of the facts constituting the fraud. *See* § 893.93(1)(b). The earliest date that Abrams contends that Paul Revere discovered or should have discovered the rele-

---

**12.** *See also Stroh Die Casting Co. v. Monsanto Co.*, 177 Wis.2d 91, 117–19, 502 N.W.2d 132 (Ct.App.1993) (applying § 893.93(1)(b) to intentional misrepresentation claim). Abrams contends that the statute of limitations for intentional misrepresentation is Wis. Stat. Ann. § 893.57, which governs intentional torts to the person. However, he cites no caselaw to support this contention, and provides no argument for the implicit claim that intentional misrepresentation should be considered a tort to the person rather than a species of fraud for statute of limitations purposes.

vant facts is in March 1996. (R. 74 at 3.) These claims, brought in September 1998, are therefore not barred under § 893.93(1)(b).

## 2. Common elements of misrepresentation

The three types of misrepresentation share three common elements: The representation must be of a fact and made by the defendant; it must be untrue; and the plaintiff must believe the representation to be true and detrimentally rely upon it. *See Whipp*, 43 Wis.2d at 169, 168 N.W.2d 201.

### a. Representation of fact

Abrams first argues that he made no representations at all; he simply recorded Lewis's representations. The general rule is that silence is not a misrepresentation—unless a party has a duty to disclose. "If there is a duty to disclose a fact, failure to disclose that fact is treated in the law as equivalent to a representation of the nonexistence of the fact." *Ollerman v. O'Rourke Co.*, 94 Wis.2d 17, 26, 288 N.W.2d 95 (1980).[13] Whether there is a duty to speak is a question of law. *See Ollerman*, 94 Wis.2d at 27, 288 N.W.2d 95. The formula provided by Restatement (Second) of Torts has been adopted by the Wisconsin Supreme Court:

> A party to a transaction is under a duty to exercise reasonable care to disclose to the other "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

*Id.*, 94 Wis.2d at 37, 288 N.W.2d 95 (quoting Restatement (Second) of Torts § 551(2)(e)).

In this case, Abrams and Paul Revere had a "broker agreement" which appointed Abrams as a "broker." (R. 39 Ex. 4.)[14] An insurance broker is an agent of the insured, rather than of the insurer. *See Master Plumbers Ltd. Mut. Liab. Co. v. Cormany & Bird, Inc.*, 79 Wis.2d 308, 313, 255 N.W.2d 533 (1977); *Production Credit Ass'n v. Gorton Farms*, 216 Wis.2d 1, 8, 573 N.W.2d 549 (Ct.App.), *petition for review denied*, 217 Wis.2d 519, 580 N.W.2d 689 (1998). Even so, Abrams may have been a "dual agent," that is, an agent of Paul Revere as well as of Lewis. *See Gilbert v. United States Fire Ins. Co.*, 49 Wis.2d 193, 199, 181 N.W.2d 527 (1970) (citing *John R. Davis Lumber Co. v. Hartford Fire Ins. Co.*, 95 Wis. 226, 70 N.W. 84 (1897) and *Wisconsin Cent. Ry. Co. v. Phoenix Ins. Co.*, 123 Wis. 313, 101 N.W. 703 (1904)) (holding that insurance broker may be agent for both the insured and the insurer, and is not exclusively the agent of the insured in procuring or extending insurance coverage). For this reason, as well as because Abrams did not contest the point, I will draw the inference in Paul Revere's favor as the nonmoving party, *see Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348, that Abrams was its agent rather than or in addition to being Lewis's broker. As the insurer's agent, Abrams would be expected to inform the insurer if he knew that an applicant made false or misleading statements on an application. Indeed, Abrams testified to this effect. (R. 90 Ex. 2 at 51.) This aspect of the relationship between Abrams and Paul Revere further indicates that Abrams had a duty to disclose any knowledge of a material falsehood on Lewis's application. *See*

---

**13.** *Ollerman* summarized the general rule—silence constitutes a representation when there is a duty to speak—in the context of intentional misrepresentation, but *Grube v. Daun*, 173 Wis.2d 30, 56, 496 N.W.2d 106 (Ct.App.1992) recognized the rule as also applying to negligent and strict responsibility misrepresentation.

**14.** As in *Production Credit Ass'n v. Gorton Farms*, 216 Wis.2d 1, 8, 573 N.W.2d 549 (Ct.App.), *petition for review denied*, 217 Wis.2d 519, 580 N.W.2d 689 (1998), both parties loosely described Abrams as an "insurance agent" throughout their briefs.

*Hennig v. Ahearn*, 230 Wis.2d 149, 168, 601 N.W.2d 14 (Ct.App.) (holding that course of parties' prior dealings may be sufficient on its own to create a duty to disclose material information), *petition for review denied*, 230 Wis.2d 273, 604 N.W.2d 571 (1999).

Abrams argues that even if he knew damaging information, his responsibilities to Lewis as his principal would have forbidden him from speaking. Abrams appears to have only skimpy support for the proposition. The one case that he cites simply holds that a seller's agent might not have had an initial duty to disclose his knowledge, because disclosure would have been contrary to the interests of his principal. *Ramsden v. Farm Credit Servs.*, 223 Wis.2d 704, 721, 590 N.W.2d 1 (Ct.App. 1998). But *Ramsden* explicitly reserves the question of whether agents have a duty not to disclose information contrary to the interests of their principals. *Id.*, 223 Wis.2d at 720 n. 12, 590 N.W.2d 1. Thus, even if Abrams were Lewis's broker and not an agent of Paul Revere, it appears to be at best an unresolved question under Wisconsin law whether he would have been allowed to stand by in silence as his principal made material statements of fact that Abrams knew to be false.

■■■ Abrams next contends that even if his silence constituted a representation, it was of an opinion and not of a fact. As relevant here, question 6 asked whether Lewis had "ever been treated for [a] mental or emotional disorder" and whether Lewis had "ever ... had any known indication of [a] mental or emotional disorder." (R. 63 Ex. 3 at 1.) Lewis answered no. As relevant here, Question 8 asked whether in the past five years, Lewis had had any medical advice, treatment, illness, or abnormality. (R. 63 Ex. 3 at 1.) Lewis answered yes, but in the space provided for details, identified only allergies and a rhinoplasty.

■■■ The courts contrast questions asking whether the applicant is healthy, has a sickness or disorder, and so on, with questions asking whether the applicant has been hospitalized or treated by a doctor: the first class is considered to ask for opinions, and the second class to ask for facts. The Wisconsin Supreme Court has ruled that the question, "Do you ... have any physical impairment or deformity or reason to believe you are not in sound physical condition?" calls for the applicant's judgment or opinion. *Nolden v. Mutual Benefit Life Ins. Co.*, 80 Wis.2d 353, 358, 366, 259 N.W.2d 75 (1977). Likewise, the statement, "I am now in good health, free from all disease, deformities, and/or ailments" calls for an applicant's opinion. *See Schneider v. Wisconsin Life Ins. Co.*, 273 Wis. 105, 111–12, 76 N.W.2d 586 (1956). The portion of question 6 asking whether Lewis had ever had known indications of a mental or emotional disorder is of this opinion kind, as are the portions of question 8 asking whether during the past five years he had had illnesses or abnormalities. For such opinion questions, the applicant's answers need only "accurately reflect his condition and history as he knows it to be." *Nolden*, 80 Wis.2d at 365, 259 N.W.2d 75. In answering such a question, "the applicant must make reasonable use of his faculties in endeavoring to understand and answer the questions asked of him and his answers must be made fairly and in good faith." *Southard v. Occidental Life Ins. Co.*, 31 Wis.2d 351, 357, 142 N.W.2d 844 (1966).[15]

■■■ When an applicant is asked such an opinion question about disorder, illness, or abnormality, the words are not applied literally but with attention to how incapaci-

---

15. Abrams observes that, during Lewis's deposition, counsel for Paul Revere objected to Lewis's being asked whether he believed he had a mental or emotional disorder during a particular period, on the ground that Lewis lacked any background to make such a diagnosis. (R. 132 Ex. 9 at 11–12.) But the basis for counsel's evidentiary objections at a deposition does not relieve an applicant's duty under *Nolden* and *Southard* to answer opinion questions honestly and in good faith.

tating the conditions are. Thus, an applicant was not suffering from a "sickness" as the word is ordinarily used where, although he had had a heart attack and continued to suffer from heart disease, because he was physically active in his business and his condition did not incapacitate him or interfere with his usual occupation. *See Nolden,* 80 Wis.2d at 366–67, 259 N.W.2d 75. Similarly, questions about disease and sickness "cannot be construed as meaning absolute freedom from any bodily ills but rather freedom from such ills as would ordinarily be called 'disease' or 'sickness.'" *Schneider,* 273 Wis. at 113, 76 N.W.2d 586 (citing *Metropolitan Life Ins. Co. v. McTague,* 49 N.J.L. 587, 9 A. 766 (N.J.1887) (finding that failure to report earlier swollen testicle which was not swollen at time of re-application did not render false the statement, "Since the date of my original application . . . I have had no sickness or personal injury of any kind nor been an inmate of any hospital or institution.")).

In this case, the disability application was filled out in March 1990. Seven years before, at the age 19, Lewis saw a psychiatrist, Dr. Kalogjera, fourteen times in 1983 following an arrest and criminal charges for participating in stealing a car stereo. (R. 90 Ex. 3 at 28.) Dr. Kalogjera testified at his deposition that these sessions constituted "psychiatric treatment, not counseling," and that Mr. Abrams attended at least one session at which Mrs. Abrams said that Lewis had been depressed since first grade. (R. 90 Ex. 3 at 63, 40.) Three years later, in 1986, Lewis saw a second psychiatrist, Dr. Blackwell, approximately seven times for depression and relationship problems, and after a gap of another three years, saw Dr. Blackwell another twenty times from July 1989 through January 1990.[16] Dr. Blackwell's first treatment note from July 1989, after Lewis resumed sessions following a three-year cessation, reads, "he became seriously depressed—insomnia—poor mood, etc." (R. 90 Ex. 10 at BB00008.)[17]

If all of this information is imputed to Abrams, I believe that to the extent that Abrams's not passing it on to Paul Revere expressed opinion rather than fact—specifically, an opinion that Lewis had never had known indications of a mental or emotional

---

16. Dr. Blackwell's treatment records reveal 7 sessions from May through July 1986 (R. 90, Ex. 10 at PRL000385 & BB00008), and his billing records indicate charges for 8 sessions in July 1989 (*id.* at BB00030), 8 in August 1989 (*id.* at BB00025), and 4 in January 1990 (*id.* at BB00023).

Dr. Blackwell's billing records indicate charges for 23 later sessions: 6 in July 1990 (*id.* at BB00022); 5 in October 1990 (*id.* at BB00019); and 12 in July 1991 (*id.* at BB00017). This totals 50 sessions. Dr. Blackwell testified in his deposition that there were 45, (R. 90, Ex. 9 at 28), but I see no reason to think the discrepancy important.

17. Evidence has also been submitted that around 1969 or 1970, when Lewis would have been roughly age five or six, Mr. and Mrs. Abrams took the family (there is another child as well) for family counseling for as much as twelve weeks. (R. 89, Add'l Proposed Fact 34.) I find that those sessions were sufficiently distant in time from Lewis's application in 1990—twenty years later, at age 26—that it would not have been material to Paul Revere's decision to insure Lewis.

The parties have additionally expended considerable effort tracking down and—after the deadline for submitting reply briefs—have submitted no fewer than nine filings providing affidavits from educators who taught Lewis in what was titled an "emotionally disturbed" program from fifth to seventh grades. (R. 144–46, 148–52, 154.) Such late-submitted material may properly be disregarded. *See* Local Rule § 6.01(c), *Boustead v. Barancik,* 151 F.R.D. 102, 107 (E.D.Wis.1993) (Gordon, J.); *Hartley v. Wisconsin Bell, Inc.,* 930 F.Supp. 349 (E.D.Wis.1996) (Gordon, J.); *Baugh v. City of Milwaukee,* 823 F.Supp. 1452, 1456 (E.D.Wis.1993) (Evans, C.J.), *cited with approval in Beck v. University of Wisconsin Bd. of Regents,* 75 F.3d 1130, 1134 n. * (7th Cir.1996). Nonetheless, it appears that, despite the title "emotionally disturbed," students were not enrolled in the program based upon medical or psychiatric diagnoses or assessments, but rather based upon behavior problems in class, (R. 149 ¶¶ 3–4; R. 150 ¶¶ 5–6), and that Mr. and Mrs. Abrams would not have been told otherwise (R. 149 ¶ 6; R. 150 ¶ 8). Thus, even if I were to consider this late-submitted information, it would have no effect on my determinations.

disorder, and that Lewis had not had any illnesses or abnormalities during the past five years—it was an opinion with sufficient factual content that it is reasonable to allow a jury to determine whether it was given fairly and in good faith. Thus, even if some of Paul Revere's application questions do ask for lay opinions rather than medical conclusions, they are nonetheless subject to the requirement of *Nolden*, 80 Wis.2d at 365, 259 N.W.2d 75, and *Southard*, 31 Wis.2d at 357, 142 N.W.2d 844, that even lay opinions must be offered fairly and in good faith.

### b. Falsity of representation

██ On the first type of question—seeking opinions about whether Lewis had ever had indications of mental or emotional disorders, and whether during the previous five years he had suffered any illnesses or abnormalities—Abrams is liable only if his silence indicated an opinion that was not given fairly and in good faith. Thus, Abrams's state of mind is relevant for this first type of question. Abrams testified at his deposition that he believed that Lewis's meetings with Dr. Kalogjera were simply intended to allow Dr. Kalogjera to gather material useful to testifying on Lewis's behalf at hearings stemming from the alleged car break-in and stereo theft. (R. 63 Ex. A at 144.) Lewis testified at his deposition that he was sure he did not discuss with either of his parents what happened in Dr. Kalogjera's office, because it was not in his personality. (R. 63 Ex. L at 22, 25.) In addition, Abrams testified that during the time that Lewis was seeing Dr. Blackwell, he had no reason to think that Lewis was suffering from an emotional or mental disorder. (R. 63 Ex. A. at 85.) Lewis testified that he did not tell his father that he was depressed, had no recollection of telling either of his parents that he was seeing Dr. Blackwell, and further testified that it would not have been his personality to tell his father that he was seeing Dr. Blackwell and that he "highly doubted" that he would have told his mother either that he was depressed or that he was seeing Dr. Blackwell. (R. 63 Ex. L. at 31–32.)

This testimony, if credited, would show that knowledge of Lewis's condition and treatment history should not be imputed to Abrams. It would therefore show that he did not give an unfair or bad faith opinion by remaining silent. But granting summary judgment on the basis of such deposition testimony is inappropriate, because a jury should make the relevant credibility determination. Where knowledge of the events or occurrences on which an element is based lies exclusively within the control of the party moving for summary judgment—as in actions involving the moving party's state of mind—"[c]ourts have been reluctant to deprive the nonmoving party of the opportunity of testing the credibility of the movant's witnesses in open court." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726 at 453 (3d ed.1998).[18]

The second kind of question, asking whether the proposed insured was seen or treated by doctors, is a factual question. Insofar as Abrams's silence constituted representations that Lewis had never been treated for a mental or emotional disorder

---

**18.** Paul Revere asserts a second basis for imputing knowledge to Abrams: insurance billing records showing Lewis's 1986 sessions with Dr. Blackwell may have gone to Lewis's mother, Barbara Abrams. She testified at her deposition that she had no distinct memory of any such bills, but that if she had received them she would have passed them on to her husband. (R. 90 Ex. 11 at 78–79.) But Paul Revere has not introduced any such insurance billing records, much less shown that they indicated what Lewis was being treated for.

Paul Revere also relies upon stereotyped assumptions that, as Lewis's father, Abrams would naturally know of Lewis's condition and treatment history, and quotes Dr. Blackwell as saying that as a general matter he expects that his patients would speak about their treatment with their intimate family. (R. 90, Ex. 9 at 96). With regard both to the content of any 1986 insurance bills and to stereotypes based upon the father-adult son relationship, speculation is not sufficient to thwart a summary judgment motion. *See Whetstine*, 895 F.2d at 392.

and that Lewis had not had any medical advice or treatment within the past five years, there is a material issue about whether those representations were false.

To be sure, Abrams asserts that he was unaware that Lewis's representations were false (and indeed appears to defend Lewis's omission of certain sessions as not making a false representation, such as the sessions with Dr. Kalogjera). But a defendant's ignorance that a representation was false is irrelevant for all but intentional misrepresentation; an unknowing misrepresentation is the crux of strict responsibility and negligent misrepresentation. *See Whipp*, 43 Wis.2d at 170, 168 N.W.2d 201 ("[i]ntent to deceive and good-faith belief in the truth of the representation are immaterial") (strict responsibility); ("the defendant need only fail to exercise ordinary care in making a misrepresentation or in ascertaining the facts") (negligent misrepresentation).

#### c. Reliance

■ The third element of misrepresentation is reliance: the plaintiff must prove that it relied upon the defendant's representations and was damaged by that reliance. *See Whipp*, 43 Wis.2d at 169, 168 N.W.2d 201. The Wisconsin Supreme Court has acknowledged the conceptual difficulty of assessing reliance in cases where nondisclosure is treated as a misrepresentation. *See Ollerman*, 94 Wis.2d at 43 n. 26, 288 N.W.2d 95 (quoting Goldfarb, *Fraud and Nondisclosure in the Vendor–Purchaser Relation*, 8 W. Reserve L.Rev. 5, 6–9 (1956)). But the solution, as in assessing reliance on a positive representation, is simply to determine whether the omission led to a different result than would have occurred if disclosure had been made.

■ Abrams argues that any reliance that Paul Revere placed in his silence was not justified, because Lewis signed an authorization allowing Paul Revere to contact and get records from his primary care physician, Dr. Sennett; and those records would have led Paul Revere to Dr. Blackwell and Dr. Kalogjera. Thus, Abrams

argues, it is Paul Revere's failure to investigate the proposed insured, rather than Abrams's silence, that led to its decision to insure.

■ To the contrary, the law in Wisconsin is that a plaintiff is justified in relying on a defendant's representations unless their falsity is obvious. *See Household Fin. Corp. v. Christian*, 8 Wis.2d 53, 56, 98 N.W.2d 390 (1959) (quoting *Jacobsen v. Whitely*, 138 Wis. 434, 436, 120 N.W. 285 (1909)). Abrams relies on a Minnesota case, *St. Cloud National Bank & Trust Co. v. Woodmen of the World Life Insurance Society*, 451 N.W.2d 75, 80 (Minn.Ct.App. 1990), but this case simply applies Minn. Stat. § 61A.11 (1988), which held that where life insurance is issued without a medical examination, the proposed insured's statements on the insurance application void coverage only if they were wilfully false or intentionally misleading. Even if Wisconsin had a similar statute that governed disability insurance (which Abrams does not argue), *St. Cloud* would merely help address whether Lewis's representations voided his insurance coverage, not whether Paul Revere was entitled to rely upon Abrams's representations. The law in Wisconsin explicitly *denies* that a plaintiff "shall meet every positive statement with incredulity and must search to ascertain whether it is false." *Household Fin. Corp.*, 8 Wis.2d at 56, 98 N.W.2d 390 (quoting *Jacobsen*, 138 Wis. at 436, 120 N.W. 285). Nothing on the face of Lewis's application made obvious that there was any falsity to its claims that Lewis had never had known indications of or been treated for mental or emotional disorder and that he had not received medical treatment or advice during the past five years. (R. 63 Ex. G at 60.) Paul Revere was thus entitled to rely upon Lewis's representations on the application and Abrams's representations by silence without conducting an additional investigation. Accordingly, all three common elements of misrepresentation are present.

### 3. Intentional misrepresentation

 Intentional misrepresentation has two elements beyond those common to all forms of misrepresentation. First, the defendant must either have known the representation was untrue or have made the representation recklessly without caring whether it was true or false; second, the defendant must have made the representation with intent to deceive and induce the plaintiff to act upon it to the plaintiff's pecuniary damage. *See Whipp*, 43 Wis.2d at 168, 168 N.W.2d 201. These elements (and the three common elements) must be proven by the "middle" burden of proof, that is, with evidence that clear, satisfactory, and convincing. *See* Wis. JI—Civil 205 (1998), 2401 cmt. at 5 (1997).

 Abrams makes no arguments against these two elements particularly. The competing evidence discussed above— for example, both Lewis and Abrams testified that Lewis did not tell either of his parents about the content of his sessions with Dr. Kalogjera and did not tell them at all about seeing Dr. Blackwell, because it was not in his personality, while other evidence indicates that Abrams attended at least one session with Dr. Kalogjera at which Lewis's depression was discussed— is sufficient to create a material question of fact which must go to the jury.

### 4. Negligent misrepresentation

 Negligent misrepresentation has only one element beyond the three common elements for all forms of misrepresentation: The defendant must have failed to exercise ordinary care in making a misrepresentation or in ascertaining the facts where a duty of care is required or voluntarily assumed. *See Whipp*, 43 Wis.2d at 170, 168 N.W.2d 201. In this case, as discussed above, I must assume for summary judgment purposes that Abrams owed Paul Revere a duty of care. In addition, Paul Revere has offered evidence that Abrams was present for at least one meeting with Dr. Kalogjera at which Lewis's being depressed was discussed. (R. 90 Ex. 3 at 40.) Whether Abrams fell short of his duty of care is a material question of fact to be submitted to the jury.

### 5. Strict responsibility misrepresentation

 Strict responsibility misrepresentation—sometimes referred to as "innocent misrepresentation" in the treatises— has been called "perhaps the least understood" of the three forms of misrepresentation recognized in Wisconsin. Mark C. Young, *Strict Responsibility for Fraud in Wisconsin*, Wis. B. Bull., Jan. 1987, at 15, 15. Whether the defendant knew or did not know the represented facts is immaterial to strict responsibility. *See Whipp*, 43 Wis.2d at 170, 168 N.W.2d 201. When strict responsibility liability is imposed, it is not due to the defendant's knowledge or negligence, but rather due to public policy. *See Reda v. Sincaban*, 145 Wis.2d 266, 269, 426 N.W.2d 100 (Ct.App.1988). The policy is that when a loss arises because an innocent defendant misled an innocent plaintiff, the loss should be borne by the party which made the misrepresentation in cases where public opinion seems to call for such a result. *See Stevenson v. Barwineck*, 8 Wis.2d 557, 562, 99 N.W.2d 690 (1959) (quoting Prosser, *Law of Torts* § 88 at 548 (2d ed.)). The policy seeks to enforce the common sentiment that a speaker ought to have known the facts represented or else ought not to have spoken. *See Gauerke v. Rozga*, 112 Wis.2d 271, 280, 332 N.W.2d 804 (1983) (quoting Wis. JI—Civ. 2400 (citing *Palmer v. Goldberg*, 128 Wis. 103, 111, 107 N.W. 478 (1906))).

 The elements unique to strict responsibility misrepresentation are first, that the defendant had an economic interest in the transaction; and second, that the misrepresentation must be made on the defendant's personal knowledge or under circumstances in which he necessarily ought to have known the truth or untruth of the statement. *See Whipp*, 43 Wis.2d at 170, 168 N.W.2d 201; *see also Grube v. Daun*, 173 Wis.2d 30, 55, 496 N.W.2d 106 (Ct.App.1992); *Stevenson*, 8 Wis.2d at 562–

63, 99 N.W.2d 690 (quoting Prosser, § 88 at 548).

As to the first element, Abrams appears to concede that he received a commission for the policy here. (R. 61 at 14.) At least two of the major commentators urge that the rationale of shifting the burden of an economic loss to the party which caused it is absent or considerably diminished where the defendant's only economic interest is a commission, in contrast to the paradigm case in which the defendant's gain corresponds to the plaintiff's loss. *See* Fowler V. Harper et al., 2 *The Law of Torts* § 7.7 at 420–21 (2d ed.1986); *see also* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* 748 (5th ed.1984) (finding it a "difficult question" when the recovery for strict responsibility misrepresentation is not limited "to the amount of the unjust enrichment or benefit acquired by the misrepresenter"). An alternative rationale, of protecting safe markets by inducing reliance on "positive and unequivocal statements of fact," Harper et al. § 7.7 at 421, is also absent here, because Abrams did not make positive and unequivocal statements about his son's condition or treatment history. Nonetheless, the Wisconsin Supreme Court has held that the requirement of an economic interest in the transaction is satisfied where a broker stands to benefit economically if a transaction is made. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck,* 127 Wis.2d 127, 140, 377 N.W.2d 605 (Wis.1985).

■ Attention thus focuses on strict responsibility's second unique element: Should Abrams necessarily have known about Lewis's condition and treatment history? Paul Revere relies upon the third element of the pattern jury instructions:

Thirdly, that (defendant) made the representation as a fact based on (his)(her) own personal knowledge, or in circumstances in which (he)(she) necessarily ought to have known the truth or untruth of the statement. (Plaintiff) must prove that (defendant) represented the fact from (his)(her) personal knowledge, or was so situated that (he)(she) either had particular means of ascertaining the pertinent facts, or (his)(her) position made possible complete knowledge and (his)(her) statements fairly implied that (he)(she) had it.

Wis. JI—Civil 2402 at 1–2 (1993) (emphasis omitted from parentheticals). Because Abrams did not represent his silence as being based on his personal knowledge, and did not make statements implying that he had complete knowledge, the pattern jury instruction is fulfilled only if Abrams kept silent "in circumstances in which [he] necessarily ought to have known the truth or untruth of the statement [because he] was so situated that [he] had particular means of ascertaining the pertinent facts." *Id.* at 1. Paul Revere argues that Abrams necessarily ought to have known the truth because his position as both Lewis's agent and father provided him with precisely such particular means of ascertaining the facts.

The "particular means of ascertaining" portion of third element of the pattern jury instruction is based not upon Wisconsin caselaw, but upon a 1938 law review article. *See* Wis. JI—Civil 2402 at 5 n. 8 (citing Fowler V. Harper & Mary Coate McNeely, *A Synthesis of the Law of Misrepresentation,* 22 Minn. L.Rev. 939, 987–88 (1938)).[19] Another aspect of the same law review article, repeated verbatim in *Whipp,* 43 Wis.2d at 170, 168 N.W.2d 201, has already been criticized by the Wisconsin Supreme Court as not clearly explaining the point. *See Gauerke,* 112 Wis.2d at 279, 332 N.W.2d 804 (criticizing the law review article as "not clearly explain[ing] the significance of the investigation factor" repeated in *Whipp* ).

The portion of the pattern jury instructions asserting that "necessarily ought to have known the truth" is satisfied when the defendant had a "particular means of ascertaining the facts" is also taken from

19. Actually, the pattern jury instruction erroneously cites "Fowler and Harper" rather than "Fowler V. Harper," and makes no reference to McNeely.

the 1938 law review article. *See* Harper & McNeeely, 22 Minn. L.Rev. at 987. The phrase has since been repeated in two Wisconsin Supreme Court decisions. *See Merrill Lynch*, 127 Wis.2d at 140, 377 N.W.2d 605 (quoting *Gauerke*, 112 Wis.2d at 280, 332 N.W.2d 804 (quoting Law Notes for Trial Judges in Wis. JI—Civ. 2400 (quoting Harper and McNeely,[20] 22 Minn. L.Rev. at 988))).

I must predict how the Wisconsin Supreme Court would apply state law in this case. *See Kaplan v. Pavalon & Gifford*, 12 F.3d 87, 89 (7th Cir.1993). Although pattern jury instructions may be persuasive authority of Wisconsin law, they are not precedential authority. *See Runjo v. St. Paul Fire & Marine Ins. Co.*, 197 Wis.2d 594, 604, 541 N.W.2d 173 (Ct.App. 1995) (citing *State v. O'Neil*, 141 Wis.2d 535, 541 n. 1, 416 N.W.2d 77 (Ct.App. 1987)). The *Gauerke* decision shows that even when other language from the 1938 law review article has been adopted in prior Wisconsin Supreme Court decisions (as *Whipp* did), the Wisconsin Supreme Court will look beyond the particular phrase to examine the proposition for which it stands and whether it is clearly explained in the article. Thus, the mere fact that *Gauerke* and *Merrill Lynch* repeat the "particular means of ascertaining" language does not indicate that the Wisconsin Supreme Court would regard itself as bound by that language if it found that it did not reflect the law review article's position.

In this instance, the "particular means of ascertaining" language does not fairly represent the Wisconsin view. As applied here, it would allow plaintiffs to prevail where they had no idea that a defendant had particular means of ascertaining the relevant facts, and thus had not relied upon the defendant's ability to ascertain the facts. In short, the requirement of

reliance applies not only to the plaintiff's reliance on the defendant's representation, but also to the plaintiff's reliance upon the defendant's appearing to be in a position to know the facts. This interpretation is shared by Young, *supra*, at 15: "The key is thus that the listener reasonably can assume that the party making the representation knows his subject before making the representation."

Fowler and McNeely agree. The rationale behind actions for misrepresentation, either in strict responsibility (what they call "innocent misrepresentation") or in negligence, is to enhance mutual confidence between buyer and seller. If a seller makes an express representation and was in a position to know the facts, the seller must be held liable to protect the buyer's justifiable expectations. *See* Fowler & McNeely, 22 Minn. L.Rev. at 962–63. But the only cases that are discussed are those where the defendant represented that he knew the facts or reasonably appeared to the plaintiff to be in position to know. *See id.* at 968–69. Thus—two sentences after the phrase about defendants who have particular means of ascertaining the facts— "the cases involving innocent misrepresentation disclose situations in which the defendant professes complete knowledge of the facts or normally could be expected to know them without any special investigation." *Id.* at 988. An action against Abrams for strict responsibility because—unbeknownst to Paul Revere—he was Lewis's father and thus allegedly had particular means of ascertaining the facts does not advance the public policy on which strict responsibility rests, and is at odds with the reasoning behind the law review article from which the "particular means" language is drawn.[21]

---

**20.** The Law Notes in Wis. JI—Civ. 2400, as well as the pattern instruction in Wis. JI—Civ. 2402, erroneously cite "Fowler and Harper" and makes no reference to McNeely.

**21.** All the same, where a defendant supplies information, the person using it is entitled to expect care and diligence to insure its accuracy. *Id.* at 988–89. Thus, as already discussed above, an action against Abrams for negligent misrepresentation is fully appropriate.

The *Merrill Lynch* decision supports this analysis. In that case, a Merrill Lynch futures broker did not inform a customer that Brazil had increased its soybean crop estimates, which meant that the prices for Brazilian soybean futures would go down. The Wisconsin Supreme Court considered whether strict responsibility was present due to the failure to inform (despite the tension with strict responsibility's declared policy rationale of giving sellers an incentive not to speak if they do not know, *see Gauerke,* 112 Wis.2d at 280, 332 N.W.2d 804). But it held that the plaintiff had not shown that Merrill Lynch made untrue representations based on the broker's own personal knowledge, or in circumstances which indicated that he had particular means of ascertaining the relevant facts, or that his position made possible complete knowledge or that his statements fairly implied that he had such knowledge. *Merrill Lynch,* 127 Wis.2d at 140–41, 377 N.W.2d 605 (citing *Stevenson,* 8 Wis.2d at 562–63, 99 N.W.2d 690 *and* Law Notes for Trial Judges in Wis. JI—Civ. 2400).

In this case, as discussed above, the only claim available to Paul Revere is that Abrams's position as father and as broker gave him particular means of ascertaining the facts. But the circumstances did not indicate that Abrams was Lewis's father; the only information that Paul Revere sought about the relationship between broker and proposed insured was the length of their acquaintance, which Abrams truthfully answered was twenty-six years, and Paul Revere does not even assert that it knew that Abrams was Lewis's father when it issued the policy. Thus, even if being the father of an adult son necessarily gave Abrams particular means of ascertaining Lewis's condition and treatment history, the circumstances did not indicate to Paul Revere when it made the decision to insure that Abrams had particular means. Paul Revere may benefit from this later discovery on a theory of negligent misrepresentation—where it could argue that Abrams was negligent in not ascertaining the truth—but cannot benefit from it on a theory of strict responsibility misrepresentation.

The *Merrill Lynch* decision further indicates that even if Paul Revere were allowed to benefit from Abrams's position as Lewis's father—despite knowing nothing about that position when it relied upon Abrams's silence—Abrams's position as Lewis's father would not of necessity mean that Abrams ought to have known the truth about Lewis's condition. Just as foreign crop estimates change without a broker's necessarily being on notice, *Merrill Lynch,* 127 Wis.2d at 141, 377 N.W.2d 605, so *King Lear*'s examples of Cordelia and Lear, Edmund and Gloucester, teach that adult children, for reasons sufficient unto themselves, will allow their parents to believe things of them that are not true. Dr. Blackwell's statement that he expects that his patients discuss their therapy sessions with their "intimate family" (R. 90, Ex. 9 at 96) underscores the point: not every family is intimate, and not every family bond is so intimate that indications of mental disorder and psychiatric treatment are discussed. Paul Revere's argument that there is evidence that Abrams actually knew of Lewis's condition and treatment history is irrelevant because, as already discussed, the defendant's knowledge or ignorance of the facts is immaterial to strict responsibility misrepresentation; all that matters is whether the defendant represented to the plaintiff that he knew the facts, or reasonably appeared to the plaintiff to be in a position necessarily to know the facts.

That Abrams was Lewis's broker is of course no guarantee that Abrams would know of Lewis's condition and treatment history; it is not uncommon for proposed insureds to conceal damaging information from an insurance broker. Paul Revere's best argument is that because Abrams had known Lewis for twenty-six years, and so indicated on the application form, Abrams would necessarily have known of Lewis's condition and treatment history, because he would have had particular means of

ascertaining the truth. But Abrams's answer is just as consistent with being Lewis's long-time neighbor down the block as being his parent; and in both cases, there would be no necessity that he would know the truth and no particular means of ascertaining that the proposed insured was telling the truth. Thus, the second distinctive element of strict responsibility for misrepresentation is not present, and the claim is dismissed.

## B. Breach of Fiduciary Duty

■ Abrams contends that Paul Revere's breach of fiduciary duty claim is barred by the statute of limitations. The applicable statute of limitations is that for intentional torts, Wis. Stat. Ann. § 893.57 (West 1997). *See Warmka v. Hartland Cicero Mut. Ins. Co.*, 136 Wis.2d 31, 35, 400 N.W.2d 923 (1987). This statute requires that actions must be brought within two years of when the cause of action accrues. *See* § 893.57. Wisconsin applies the "discovery rule" for the time of accrual for tort causes of action. *See Hansen v. A.H. Robins, Inc.*, 113 Wis.2d 550, 560, 335 N.W.2d 578 (1983). Under the discovery rule, tort claims accrue when the injury is discovered or with reasonable diligence should be discovered, whichever occurs first. *See id.*

■ Abrams argues that Paul Revere was aware of the possibility of a breach of fiduciary action by March 13, 1996, but that it waited nearly two and a half years, until September 2, 1998, to bring its claim of breach of fiduciary duty against him. Specifically, Paul Revere's initial claims examiner on Lewis's claim, Pat Hurley, wrote as follows on March 13, 1996 on a field transmittal addressed to Mike O'Brien:

> Insd's emotional problems and treatment clearly existed prior to claim and prior to issue. The agent is the insured's father and would have known of emotional problems when he took app. Why was that info left off the app? . . . Dr. Blackwell's 5–21, 86 note states family members have been involved in both indiv. and family therapy on several oc-

casions. . . . So father knew of problems. . . . We need to visit with agent for explanation and statement. Call George Thompson, legal, [phone extension omitted] prior to your visit. Appears there is a breach of fiduciary trust on behalf of agent. Please call me also.

(R. 122 Ex. 1 at PRL000500, PRL000503–04.)

Paul Revere responds that this March 1996 field transmittal does not evidence discovery of an injury, because it wished to investigate the potential legal claim carefully to avoid launching an unfounded or irresponsible allegation. Specifically, in May 1996, O'Brien interviewed Abrams and Lewis separately, with Abrams saying that he was unaware that Lewis had any mental health problems when he filled out Lewis's application, and O'Brien asking no questions of Lewis concerning either the application or what Abrams knew about his condition or treatment history at the time of the application (R. 122 Ex. 3); in June 1996, Paul Revere referred Lewis's claim to in-house counsel Thompson; in June 1997, Paul Revere requested Dr. Kalogjera's records; and on June 26, 1997, it received them. According to Paul Revere, it had sufficient information to form an objective belief of breach of fiduciary duty only after receiving Dr. Kalogjera's records, because before that it had only circumstantial evidence that Abrams was aware of Lewis's condition, while Dr. Kalogjera's records showed that Abrams was present at a 1983 session at which Lewis's being depressed was discussed.

Paul Revere relies upon *Borello v. U.S. Oil Co.*, 130 Wis.2d 397, 388 N.W.2d 140 (1986), for its explication of the discovery rule enunciated in *Hansen*, 113 Wis.2d at 560, 335 N.W.2d 578. In *Borello*, the plaintiff bought a new furnace in December 1977, but within weeks wrote to the furnace company that her previous furnace problems had only intensified and that she was suffering from a variety of medical symptoms. In February 1979, she again wrote to the company saying

that if she continued to be ill from the furnace, she would sue. The same day she was admitted to the hospital and released two weeks later with a diagnosis of systemic viral infection. On her return home, she found red dust on the flat surfaces of her home, and later said that she then knew that it was the furnace that was making her sick. In March 1979, she saw a doctor who told her that he did not believe her symptoms were related to the furnace and suggested a workup for allergies. Finally in October 1979, a different doctor diagnosed metal fume fever and directly linked it to the furnace. Suit was brought in November 1981, which would be timely if her discovery of injury under *Hansen* was considered October 1979, but not if it was considered December 1977, when she first complained to the furnace company that the new furnace was causing her symptoms. The Wisconsin Supreme Court ruled that a subjective lay person's belief that she was injured does not mark the accrual of a cause of action. *See Borello,* 130 Wis.2d at 412, 388 N.W.2d 140. Rather, the standard is that the statute of limitations began to run only when the plaintiff "had a basis for objectively concluding that metal fume fever from a furnace ... was probably the cause of her symptoms. At that time, discovery occurred and the cause of action accrued." *Id.* at 414–15, 388 N.W.2d 140. *Accord, Williams v. Borden, Inc.,* 637 F.2d 731 (10th Cir.1980), *cited in Borello,* 130 Wis.2d at 412–13, 388 N.W.2d 140; *Stoleson v. United States,* 629 F.2d 1265 (7th Cir.1980), *cited in Borello,* 130 Wis.2d at 414, 388 N.W.2d 140.

Paul Revere, arguing from *Borello,* contends that it had a basis for objectively concluding that Abrams's breach of fiduciary duty was the cause of its loss only after receiving Dr. Kalogjera's records. There are at least two problems with the argument. In the first instance, *Borello* discusses only a delayed discovery of negligence's causation element. For this purpose, breach of fiduciary duty has the same elements as negligence—duty of care, breach of that duty, injury caused by

the breach, and actual loss—subject to the caution that a fiduciary's duty of care is naturally greater than ordinary care. In this case, from the time of Hurley's March 13, 1996 field transmittal, Paul Revere could not claim to be ignorant that Abrams had a duty, or that it had suffered an injury and economic loss due to his not speaking. All that remained to be investigated was whether Abrams had breached his duty to disclose any material adverse information he knew about the proposed insured. The late-obtained records of Dr. Kalogjera provided some direct evidence that Abrams breached this duty.

But the cases on which Paul Revere relies correctly apply the discovery rule only to discovering the existence or cause of injury, and not to obtaining direct evidence of breach of duty. The reason is clear: once injury and cause are known, plaintiffs must act diligently to determine whether their injury was due to the breach of a duty. *See Borello,* 130 Wis.2d at 414, 388 N.W.2d 140. The rationale for the discovery rule is that it is patently unjust for the statute of limitations to begin running before a plaintiff could reasonably become aware of an injury. *See Hansen,* 113 Wis.2d at 559, 335 N.W.2d 578 ("as a practical matter a claim cannot be enforced until the claimant discovers the injury and the accompanying right of action"). Accordingly, the discovery rule:

tolls the statute of limitations until the plaintiff discovers or with reasonable diligence should have discovered that he or she has suffered actual damage due to wrongs committed by a particular, identified person. Until that time, plaintiffs are not capable of enforcing their claims either because they do not know that they have been wronged, *see Hansen,* 113 Wis.2d at 550, 335 N.W.2d 578, or because they do knot know the identity of the person who has wronged them, *see Borello,* 130 Wis.2d at 404–05 n. 2, 388 N.W.2d 140.

*Pritzlaff v. Archdiocese of Milwaukee,* 194 Wis.2d 302, 315–16, 533 N.W.2d 780 (1995).

*Pritzlaff*'s citing *Hansen* for plaintiffs' not knowing they have been "wronged" indicates that the statute of limitations period is tolled only until plaintiffs discover that they have been injured, rather than until they have acquired direct evidence of all elements of the legal cause of action. Discovery of an injury is not considered to be delayed until a plaintiff receives a valid legal opinion addressing the formal elements of an action. *See Claypool v. Levin,* 209 Wis.2d 284, 301, 562 N.W.2d 584 (1997). In this case, Hurley's field transmittal ("agent is the insured's father and would have known of emotional problems .... Appears there is a breach of fiduciary trust") makes plain that Paul Revere was fully aware of its injury and its accompanying right of action by March 1996. The discovery rule insures that the limitations period will not begin to run on plaintiffs who reasonably do not know or are unsure about whether they have been injured. It does not toll the beginning of the limitations period until plaintiffs have completed research into their potential causes of action for a known injury. The discovery rule simply does not apply to Paul Revere's delay in obtaining direct evidence to support one of the elements of its cause of action.

In the second instance, Paul Revere contends before it received Dr. Kalogjera's records, it had no basis for anything more than a suspicion or subjective belief that Abrams might have breached a fiduciary duty. To the contrary, the standard is that discovery of an injury is considered to have occurred when a potential plaintiff has information that would give a reasonable person notice of her injury and its cause. *See Claypool,* 209 Wis.2d at 300, 562 N.W.2d 584. The standard is not when the plaintiff acquires direct, rather than circumstantial, of a breach of duty; indeed there need not even be an "objective verification" of an injury. *Clark v. Erdmann,* 161 Wis.2d 428, 446, 448, 468 N.W.2d 18 (1991). Although an unsubstantiated lay belief of an injury or its cause, standing alone, is not sufficient to make the limitations period begin to run,

all that is needed is "a reasonable likelihood for an objective belief as to an injury and its cause." *Id.* at 448, 468 N.W.2d 18.

In this case, Paul Revere asserts that Abrams's telling O'Brien in May 1996 that he did not know that Lewis had been treated when he filled out the application was "facially absurd." (R. 121 at 9.) Likewise, Paul Revere argues that because Lewis signed initial and updated treatment plans during his sessions with Dr. Blackwell—plans which were in Dr. Blackwell's records—"Abrams had to have known ... about this treatment.... It strains credulity that Abrams and Lewis never discussed these issues." (R. 88 at 13.) Paul Revere's arguments indicate that it believes that a reasonable juror could find that Abrams knew of Lewis's condition and treatment history and therefore breached his fiduciary duty, even without referring to Dr. Kalogjera's records. Hurley requested Dr. Blackwell's records in December 1995 (R. 90 Ex. 10 at BB00011), and referred to them in the March 1996 field transmittal (R. 122 Ex. 1 at PRL000502). Paul Revere thus had them in hand by March 1996. Paul Revere accordingly had information by March 1996 that would give a reasonable person notice of injury and its cause. *See Claypool,* 209 Wis.2d at 300, 562 N.W.2d 584. The statute of limitations period therefore began to run in March 1996, and expired in March 1998.

■ Paul Revere contends that, under *Production Credit Association v. Vodak,* 150 Wis.2d 294, 304–05, 441 N.W.2d 338 (Ct.App.1989), Abrams is estopped from asserting the statute of limitations. The test is whether the conduct and representations of the party asserting the defense were so unfair or misleading as to unbalance the public's interest in setting a limitation on bringing actions. *See Hester v. Williams,* 117 Wis.2d 634, 645, 345 N.W.2d 426 (1984) (quoting *State ex rel. Susedik v. Knutson,* 52 Wis.2d 593, 598, 191 N.W.2d 23 (1971)). *Hester* repeats the six rules set out in *Knutson* for equitable estoppel to apply. At least the second rule is not

satisfied here. The aggrieved party must have failed to commence an action within the statutory period because of his or her reliance on the defendant's representations or act. *See Hester,* 117 Wis.2d at 644, 345 N.W.2d 426. In this case, Paul Revere has not even asserted that in postponing action against Abrams, it relied upon Abrams's May 1996 denial that he knew of Lewis's mental health problems in 1990. Indeed, if Paul Revere's current position is to be believed, then as a matter of law it could not have relied upon this denial. Reliance is never allowed when the falsity of a statement is obvious, *see Household Finance,* 8 Wis.2d at 56, 98 N.W.2d 390, and reliance is specifically forbidden in the context of equitable estoppel when it is not justifiable or reasonable, *see In re Estate of Alexander,* 75 Wis.2d 168, 183, 248 N.W.2d 475 (1977). In this case, Paul Revere calls Abrams's denial "facially absurd," (R. 121 at 9), which indicates that Paul Revere believes that relying upon the denial would not only not be justifiable or reasonable, but also that the falsity of the denial is obvious. Moreover, Paul Revere's implicit claim that Abrams's May 1996 denial induced it to delay its investigation is undercut by its failure to identify any later event that made the alleged inducement for delay cease to operate, a requirement referred to in the fourth rule. *See Hester,* 117 Wis.2d at 645, 345 N.W.2d 426.

Paul Revere further contends that the mere existence of a fiduciary duty precludes Abrams from asserting the statute of limitations. But the case on which it relies holds that "whether estoppel exists is determined by the parties' conduct, not their relationship." *Production Credit,* 150 Wis.2d at 305, 441 N.W.2d 338 (declining to apply equitable estoppel despite presence of a fiduciary relationship). Even drawing all inferences in Paul Revere's favor as the non-moving party, there is no evidence from which a reasonable jury could find that Paul Revere's conduct satisfies the reliance requirement announced in *Hester* and *Knutson* and relied upon in *Production Credit.* Accordingly,

it is not entitled to equitable estoppel, and this claim is time-barred.

### D. Implied–in–Law Indemnification

Abrams initially contended that indemnification is not an independent cause of action. In response to Paul Revere's citing such cases as *Fuller v. Riedel,* 159 Wis.2d 323, 330, 464 N.W.2d 97 (Ct.App. 1990), Abrams retreats to asserting that this claim rests solely upon other, losing, claims. Because Paul Revere is entitled to go to the jury on its claims of intentional and negligent misrepresentation, this argument does not prevail.

### E. Breach of Contract

Paul Revere contends that Abrams violated his brokerage contract with it by helping Lewis give misleading or incomplete answers on the application's health history questions in 1990. Lewis claimed disability benefits in 1995, and Paul Revere brought its claims against Abrams in September 1998. The breach of contract statute of limitations requires that claims be brought "within 6 years after the cause of action accrues or be barred." Wis. Stat. Ann. § 893.43 (West 1997). The question is thus whether Paul Revere's breach of contract claim accrued when Abrams allegedly breached his contract in 1990, or instead in 1995, when Lewis submitted his claim for benefits under the policy allegedly issued only due to Abrams's alleged breach.

■ The Wisconsin Supreme Court has spoken clearly. "[U]nder sec. 893.43, a contract cause of action accrues at the moment the contract is breached, regardless of whether the injured party knew or should have known that the breach occurred." *CLL Assocs. Ltd. Partnership v. Arrowhead Pacific Corp.,* 174 Wis.2d 604, 607, 497 N.W.2d 115 (1993) (rejecting the "discovery rule" applied in Wisconsin tort cases). The court's rationale was that in contrast to tort cases, in which potential tort claimants have little or no control over their exposure to risk of loss due to another party's tort, the parties in contract

cases by definition already know one other and can scrutinize one another and the subject matter of the contract as closely as they deem appropriate. "Consequently, there is less need for an expansive contract statute of limitations." *CLL Assocs.*, 174 Wis.2d at 612, 497 N.W.2d 115.

*CLL Associates* thus clearly articulates when a contract cause of action accrues for purposes of § 893.43. Paul Revere's only response—in a footnote—is that there was a three-justice dissent. (R. 121 at 7 n. 3.) A majority of the court nonetheless voted for the opinion, and the Wisconsin Supreme Court has continued to recognize the authority of *CLL Associates*. *See, e.g., State v. Chrysler Outboard Corp.*, 219 Wis.2d 130, 148, 580 N.W.2d 203 (1998) (extending principle of *CLL Associates* ).

Paul Revere provides two citations to old cases on suits to collect on notes. The earlier was decided on a statute of limitations governing claims against deceased persons, not a statute governing contract actions. *See Barry v. Minahan*, 127 Wis. 570, 575, 107 N.W. 488 (1906). The later is quoted because it indirectly quotes the first. *See Spellbrink v. Bramberg*, 245 Wis. 103, 106, 13 N.W.2d 600 (1944) (quoting *Bishop v. Jensen*, 212 Wis. 30, 31, 248 N.W. 771 (1933) (quoting *Barry*, 127 Wis. at 573, 107 N.W. 488)). These cases simply represent antecedents of the discovery rule that the Wisconsin Supreme Court definitively rejected for contract actions in *CLL Associates*. Under *CLL Associates*,

Paul Revere's breach of contract claim accrued when Abrams helped complete Lewis's application in 1990, and it was not filed until 1998. It is therefore barred as untimely pursuant to Wis. Stat. Ann. § 893.43.[22]

NOW, THEREFORE, IT IS HEREBY ORDERED that Paul Revere's summary judgment motion against Lewis (R. 54) is **GRANTED IN PART AND DENIED IN PART:** Granted with respect to Lewis's claim 3 (intentional infliction of emotional distress), and denied with respect to Lewis's claims 1 (breach of contract) and 2 (bad faith). Lewis's intentional infliction of emotional distress claim (claim 3) is hereby **DISMISSED.**

IT IS FURTHER ORDERED that Abrams's motion for summary judgment against Paul Revere (R. 65) is **GRANTED IN PART AND DENIED IN PART:** Granted with respect to Paul Revere claims 1 (breach of contract), 2 (breach of fiduciary duty), and 4 (strict responsibility misrepresentation), and denied with respect to Paul Revere claims 3 (intentional misrepresentation), 5 (negligent misrepresentation), and 6 (indemnification). Paul Revere's breach of contract, breach of fiduciary duty, and strict responsibility misrepresentation claims against Abrams (claims 1, 2 and 4) are hereby **DISMISSED.**

IT IS FURTHER ORDERED that Abrams's motion for leave to file an overlength reply brief (R. 130) is **GRANTED;**

22. Paul Revere's briefing again must be commented upon. It quotes the six-year statute pertaining to breach of contract cases, § 893.43, and then cites *tort* cases, each specifically decided on grounds other than the *contract* statute of limitations in § 893.43. *See Hennekens v. Hoerl*, 160 Wis.2d 144, 148 n. 2, 465 N.W.2d 812 (1991) (legal malpractice sounding in tort; court specifically applied § 893.53, which explicitly applies to actions "not arising on contract"); *Meracle v. Children's Serv. Soc'y*, 149 Wis.2d 19, 25, 437 N.W.2d 532 (negligence and infliction of emotional distress; court specifically applied three-year negligence limitation of actions); *United States Fire Ins. Co. v. E.D. Wesley Co.*, 105 Wis.2d 305, 316, 313 N.W.2d 833 (1982) (injury resulting from improvements to real

property; quoted by Paul Revere for time of accrual of action under common law; decision observed that statute rejected common law approach and explicitly applied § 893.89).

It is a staple of statute of limitations analysis that the time of accrual depends upon the kind of action. *See* Margaret DeWind & Jennifer Darling, *A Guide to Wisconsin Statutes of Limitation and Other Time Limits* § I.A at 3 (1999) ("The point at which a cause of action accrues varies depending on the circumstances of the conduct giving rise to the claim.") Paul Revere specifically cites cases for when contract actions accrue for purposes of § 893.43 which have nothing to do with contract actions and nothing to do with § 893.43.

that Lewis's motion to file a rebuttal brief (R. 142) is **GRANTED;** and that Paul Revere's motion to file a supplemental brief and amended proposed findings of fact (R. 144) is **GRANTED.**